UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

TERENCE BROCK,

        Defendant.

_____/

Case No: 24-20590
Hon. F. Kay Behm
U.S. District Judge

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO SUPPRESS (ECF No. 37)**

This matter is before the court on Defendant Terence Brock's

Motion to Suppress (ECF No. 37).  The Government filed a response

(ECF No. 40).  Brock is charged with possession with intent to

distribute methamphetamine (21 U.S.C. § 841).  ECF No. 15.  An

evidentiary hearing was held on January 27, 2026, at which several

witnesses testified, and the parties filed supplemental briefing following

that hearing.  ECF Nos. 45 (transcript), 47 (Government's brief); 48

(Defendant's brief).  The parties also provided four videos to the court,

which were admitted at the hearing and which the court has reviewed.

1

For the reasons explained below, the court **DENIES** Defendant's motion.

## I.   FACTUAL BACKGROUND

Around 8 p.m. on September 12, 2024, in Flint, Michigan, Brock was arrested by Flint Township Police Officer Matthew Lashbrook. Flint Township Police Department had received calls about an individual sitting in a black Cadillac Escalade SUV in a house's driveway from 10:00 am until approximately 7:30 pm that day.  ECF No. 1, PageID.3 (affidavit); ECF No. 37, PageID.159 (police report); ECF No. 45, PageID.250.  The house itself was linked to past drug activity and overdoses.  ECF No. 1, PageID.3; ECF No. 45, PageID.227.  Flint police received information that the same black Escalade had been seen coming to and leaving the house when it had been utilized as a drug house.  *See* ECF No. 37, PageID.162; ECF No. 45, PageID.228-29.

Lashbrook was in the area that day because he had at some point prior taken a report of stalking from a person living on the same street. ECF No. 37, PageID.162; ECF No. 45, PageID.249.  Lashbrook was already on his way to the neighborhood to follow up on that stalking complaint.  ECF No. 37, PageID.159.  The suspect's vehicle from that

2

complaint matched the general description of the SUV Brock was driving.  ECF No. 37, PageID.162; ECF No. 1, PageID.3.  The officer who fielded the information about the Escalade sitting in the driveway asked Lashbrook to follow up on that report as well while he was on that same street; Lashbrook arrived around 7:30 p.m.  ECF No. 37, PageID.162.  Lashbrook first attempted to contact the individual who had made the stalking complaint at her residence.  After that was unsuccessful, he began surveillance of Brock's Cadillac Escalade, which had tinted windows.  ECF No. 37, PageID.159; ECF No. 45, PageID.250-52.  Lashbrook then observed a person (later confirmed to be Brock) exit and reenter the vehicle, and then obtain a package (or multiple packages) from a UPS delivery driver who arrived at the residence.  ECF No. 45, PageID.253-55.  Soon after receiving the packages, Brock left the area.  *Id.* at PageID.255.  The Government alleges, and witnesses testified, that there is a common practice by drug dealers of shipping drugs to vacant homes in order to avoid detection.  *See* ECF No. 37, PageID.162; ECF No. 45, PageID.291-92, 243.

Lashbrook followed the vehicle and made a traffic stop in part because the vehicle had no insurance and dark-tinted windows.  ECF

No. 37, PageID.160.[1]  Brock was the driver and lone occupant of the vehicle and provided his identification.  Lashbrook explained the reason for the stop to Brock, who responded that he was aware that he had no insurance and had not yet made his payment.

After re-confirming that the vehicle had no insurance (ECF No. 37, PageID.160), Lashbrook returned and asked Brock to exit the vehicle.  A pat-down turned up a large amount of cash.  ECF No. 1, PageID.5; ECF No. 37, PageID.160; ECF No. 45, PageID.261.[2]  Brock provided, in the officer's view, inconsistent answers for why he was sitting in his car at the house and driveway that day.  ECF No. 1, PageID.5; ECF No. 45, PageID.261.  Brock stated he had been in the driveway since 10 a.m. (about nine hours) because he knew the homeowner; however, he could not recall the homeowner's last name. ECF No. 45, PageID.259.  Brock then stated that he was there to conduct maintenance work on the house, but Lashbrook observed no tools in the car.  ECF No. 45, PageID.261.  Lashbrook told Brock that he

---

[1] By radio-ing the vehicle's license plate, Flint dispatch confirmed the vehicle had valid registration but no insurance prior to Lashbrook performing the traffic stop.  ECF No. 37, PageID.160; ECF No. 45, PageID.256.

[2] Another officer's report puts it at $2,265 in cash on Brock's person.  ECF No. 37, PageID.162.

was more interested in what Brock was doing in the driveway of 4166 Charter Oak Drive since 10:00 a.m.  Lashbrook asked Brock whether he had drugs in his vehicle, and then asked Brock for consent to search his vehicle.

In his report, Lashbrook states that Brock "flipped back and forth between yes and no.  I informed him that I was requesting a K-9 for a free air sniff of his vehicle.  At this time, Brock changed his mind and did give me consent to search the vehicle, however still seemed concerned." *Id*.  Police ended up waiting for the K-9 to arrive and did not yet search the vehicle during this period.  ECF No. 45, PageID.262-63.

Trooper Denis McGuckin and his K-9 companion arrived on the scene after about thirty minutes.  ECF No. 40, PageID.176.  The K-9 conducted a free air sniff and had two positive alerts for narcotics on the vehicle, the second being the back right passenger wheel well directly below where the packages from UPS were stored in the vehicle.  ECF No. 37, PageID.160.

The officers then conducted a search, and two cardboard box packages from UPS were moved from the vehicle and separated

approximately five feet from each other.  ECF No. 37, PageID.160.

McGuckin's K9 then conducted a free air sniff of both boxes and alerted

for narcotics.  *Id.* at PageID.161; ECF No. 45, PageID.264.  Both boxes

were opened, and inside the boxes were two pink Barbie Doll boxes.

ECF No. 37, PageID.161.  Both of those Barbie Doll boxes were opened,

and inside were heavy, black vacuum-sealed packages.  ECF No. 45,

PageID.286.  The packages were opened, and a white crystal substance

came out of them.  Testing later confirmed the substance to be

methamphetamine.  ECF No. 37, PageID.162.

## II.   ANALYSIS

The Fourth Amendment guarantees the "right of the people to be

secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures."  U.S. CONST. amend. IV.

Generally, the amendment requires a warrant for a search, supported

by probable cause, "describing the place to be searched, and the persons

or things to be seized."  *Id.*; *see also Illinois v. Gates*, 462 U.S. 213, 238-

40 (1983).  This general requirement is subject to a number of

exceptions in regard to automobiles, and most relevantly here, those

exceptions regarding investigative stops and searches of automobiles with probable cause to do so.

In a motion to suppress evidence obtained in an unconstitutional search, the burden of production and persuasion is first on the defendant who seeks to suppress.  *See United States v. Barber*, 887 F.2d 266 (6th Cir. 1989) (citing *United States v. Feldman*, 606 F.2d 673 (6th Cir. 1979), *cert. denied sub nom Zalmanowski v. United States*, 445 U.S. 961 (1980).  The standard of proof is preponderance of the evidence.  Once a defendant meets their burden, it shifts to the United States.  Ultimately, then, once a defendant raises legitimate arguments in favor of suppression, the Government bears the burden to show by a preponderance of the evidence that its search or seizure was reasonable. *United States v. Vining*, 675 F. Supp. 3d 778, 785 (E.D. Mich. 2023) (citations omitted).

Brock argues (1) that the officer lacked reasonable suspicion for drugs when he initiated a traffic stop and that the stop was unconstitutionally prolonged absent reasonable suspicion, (2) that police lacked probable cause to search the vehicle based on the drug-sniffing dog's unreliable indications, and (3) that the government

needed a warrant to search inside the packages in the car in any case. ECF No. 37, PageID.155-56.  The Government disagrees with all of these contentions.

### A.   Reasonable Suspicion to Stop the Vehicle and Length of Stop

A traffic stop is a "seizure" under the Fourth Amendment.  *Heien v. North Carolina*, 574 U.S. 54, 60 (2014).  A police officer can justify a traffic stop in two ways.  First, a stop is justified if the police officer has probable cause that a traffic violation has occurred.  *United States v. Stevenson*, 43 F.4th 641, 645 (6th Cir. 2022).  Second, an investigatory traffic stop is justified if the officer has reasonable suspicion that criminal activity (a felony or misdemeanor) is afoot.  *Id.*  Setting aside, just for the moment, whether Lashbrook had reasonable suspicion to stop Brock's vehicle to investigate drug dealing, there is no dispute here that Lashbrook had probable cause to stop Brock for a traffic violation. *See* ECF No. 37, PageID.148 (admitting that Lashbrook knew, when he stopped Brock, that Brock had no insurance and tinted windows).  As long as there are objective and articulable facts supporting probable cause for the traffic stop, it does not matter the traffic violation was

pretextual, or that the subjective motivation of the police was to investigate something other than a traffic violation. *See United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) ("[A]n officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, . . . ."). So the parties' dispute in this case turns on whether, as Brock argues, the traffic stop was unreasonably prolonged to investigate Lashbrook's suspicion of drug trafficking. *See United States v. Stepp*, 680 F.3d 651, 663 (6th Cir. 2012). The original purpose of the stop, in Brock's view, was for the lack of insurance and tinted windows. Therefore, the only time allotted for the stop should have been to handle those matters. The twenty (or so) minutes spent waiting for the K-9 to perform a free air sniff was a violation of the Constitution's shield against unreasonable seizures. Brock also argues that it was almost an hour between the initial stop and the eventual arrest. ECF No. 37, PageID.153.[3]

---

[3] A seizure for a traffic violation justifies a police investigation of that violation, and officers can engage in "ordinary inquiries incident to the stop." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). However, officers need reasonable suspicion of another crime to prolong the duration of a traffic stop beyond the time it takes "to address the traffic violation that warranted the stop" and "attend to related safety concerns." *Id.* at 354; *United States v. Brewer*, 858 F. App'x 888, 889–90 (6th Cir., 2021).

The government argues that Brock's framework is the wrong one: "Brock's reliance on cases ruling that waiting for a K-9 unreasonably prolonged a traffic stop, such as *United States v. Stepp,* 680 F.3d 651, 663 (6th Cir. 2012), is misplaced. . . .  There was reasonable suspicion to investigate both Brock's possible relationship to the prior stalking investigation, and, more importantly, Brock's possible involvement in drug trafficking.  It is not analogous to a traffic stop." ECF No. 40, PageID.176.

The court generally agrees with the Government's framework.[4] Law enforcement officers may initiate a traffic stop not only for traffic violations, but if they have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).  That is, the stop must be "supported by reasonable suspicion of wrongdoing."  *United States v. Flores*, 571 F.3d 541, 544 (6th Cir. 2009); *see also United States v. Blair*,

---

[4] The Government asserts that among the reasons for reasonable suspicion was the possible connection to the stalking case.  ECF No. 47, PageID.306; ECF No. 45, PageID.288.  The court agrees that Lashbook credibly testified that this was part of his reason for stopping Brock's vehicle.  But because stalking is not directly related to drug activity, however, the court focuses only on those indicia which could lead to a reasonable suspicion of drug activity in particular.

10

524 F.3d 740, 748 (6th Cir. 2008) (explaining that "an officer must have probable cause to make a stop for a civil infraction" but only needs "reasonable suspicion of an ongoing crime to make a stop for a criminal violation").

To establish reasonable suspicion, a law enforcement officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968).  There is no "neat set of legal rules" defining reasonable suspicion.  *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citation omitted).  Rather, the standard is "based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).  While a "mere hunch does not create reasonable suspicion," *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (internal quotation marks omitted), the standard is less than what is required to establish probable cause.  *Navarette*, 572 U.S. at 397 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Reasonable suspicion arises based on the totality of the circumstances.  *District of Columbia v. R.W.*, 146 S. Ct. 1069 (2026); *see also United States v. Sheckles*, 996 F.3d 330, 343 (6th Cir. 2021) (noting that reasonable

suspicion is "not a high bar" (citation omitted)). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal quotation marks omitted).

By the time Lashbrook initiated the traffic stop, he had a reasonable suspicion that Brock was transporting drugs. He knew that Flint police had received credible tip that Brock had been sitting in his vehicle in the driveway of a house for nine hours that day, which is objectively a very unusual length of time to remain inside a parked vehicle. He had reason to believe that the house was used and had been used in the past for drug activity. He knew that Brock's black Cadillac Escalade had been identified by neighborhood residents as one that had transported drugs to or from that house in the past. He knew, or had good reason to believe, that Brock was not the owner of the house. He knew, or had good reason to believe, that the house was vacant at the time. ECF No. 45, PageID.227. His information was that Brock told a neighbor that he was there to pick up a package, but Brock had provided the name of someone not associated with the address

previously.  ECF No. 45, PageID.230, 235.  He had personally observed, minutes before, Brock accept packages from a UPS driver and then, after having remained in the driveway for hours, drive off quickly after receiving the package.  The Government has presented evidence that it is a common practice of drug dealers to ship drugs to vacant homes in order to avoid detection, knowledge that Lashbrook could reasonably draw on.  *See Arvizu*, 534 U.S. at 273; ECF No. 45, PageID.233, 243.  While some of these alone might only add up to a "hunch," combined they meet the reasonable suspicion threshold to initiate a stop.

Defendant's view is that "the uncorroborated drug-house label, and the facially innocent conduct, is an anonymous, multi-layered hearsay tip about a vehicle parked at a vacant house[,]" and is "a mere hunch."  ECF No. 48, PageID.314.  But the Supreme Court has consistently said that reasonable suspicion "need not rule out the possibility of innocent conduct."  *Navarette v. California*, 572 U.S. 393, 403 (2014); *see United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (finding that even if activity of loading/unloading luggage at a hotel could have an innocent explanation, reasonable suspicion for drug activity was met under the circumstances).  Under these facts, there

13

was enough information to create reasonable suspicion justifying an investigatory stop.

The length of a traffic stop "may stretch as long as the officer reasonably needs to complete the mission for which it began." *United States v. Williams*, 68 F.4th 304, 307 (6th Cir. 2023) (internal quotation marks omitted). But if the officers extend a seizure "beyond the time reasonably required to complete that mission," then it may "become unlawful." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). And "if the officer wants to continue the stop for other reasons, []he must demonstrate an additional modicum of reasonable suspicion." *Williams*, 68 F.4th at 307. During the initial stop, Brock's answers to Lashbrook's questions did nothing to dispel the officer's original suspicion of illegal drug activity. Brock claimed he knew the prior owner of the house and was doing him a favor, but did not provide a satisfactory explanation why he was in the driveway of the vacant house all day. He acknowledged being in the driveway all day, but did not explain specifically why, nor mention that he had received packages at the residence, though the officer had seen him do just that moments before. Brock claimed he knew the homeowner as someone who had helped

14

raise him, but could not recall the homeowner's last name.  ECF No. 37, PageID.160.  Brock told Lashbrook had performed maintenance at the house, but Lashbrook did not observe any tools in his vehicle.  *Id.*  A pat-down of Brock turned up about $2,000 in cash on his person in small denominations.  These kinds of inconsistencies added to the suspicion analysis.  *See Williams*, 68 F.4th at 308 (noting that "oddities and inconsistencies" in a driver's story can contribute to reasonable suspicion of drug trafficking); *see also United States v. Torres-Ramos*, 536 F.3d 542, 552 (6th Cir. 2008) (inability to remember van owner's last name contributed to reasonable suspicion that van was unlawfully possessed).  Brock's answers, alongside the other information in the officer's possession, justified Lashbrook's reasonable suspicion that Brock had illegal drugs in the vehicle.[5]

Lashbrook and the other officers at the scene then elected to wait for the arrival of a K-9 unit, which is the main period of delay that Defendant challenges.  When law enforcement officers have a

---

[5] Defendant points out that Lashbrook used the word "hunch" – or, rather, defense counsel used that word, and Lashbrook did not correct him.  ECF No. 48, PageID.312; ECF No. 45, PageID.276.  In any case, how Lashbrook may or may not have referred to the information he had does not control the court's legal conclusion as to the sufficiency of the information at his disposal.

reasonable suspicion that a vehicle contains contraband, courts routinely find that officers may continue a traffic stop while awaiting the arrival of a drug-sniffing dog.  *See Sheckles*, 996 F.3d at 345 (48-minute delay); *United States v. Perez*, 440 F.3d 363, 373 (6th Cir. 2006) (one hour); *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (30 to 45 minutes); *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (35 minutes); *see also United States v. Knuuttila*, No. 24-1211, 2025 WL 2506607, 2025 LX 395798, at \*19 (6th Cir. Sep. 2, 2025) (collecting cases, and finding 10 minutes not unreasonable).  It does not matter, as Defendant argues, that Lashbrook did little to continue the investigation in the meantime; the waiting for the dog was itself a legitimate reason to prolong the stop.  *See* ECF No. 48, PageID.315.

Given that the approximately 30 minute delay while awaiting a drug sniffing dog in this case falls comfortably alongside the cases above, the court must conclude that the duration of the stop was reasonable in light of Lashbrook's goal to confirm or dispel his suspicion that Brock was transporting drugs.  *See Williams*, 68 F.4th at 307; *see also United States v. Floyd*, No. 23-cr-20507, ECF No. 27, PageID.189 (E.D. Mich. Nov. 27, 2024) (stop not unconstitutionally extended to wait

16

for drug sniffing dog 14 minutes into stop).  The duration of the stop was reasonable.

### B.    Probable Cause to Search Vehicle

In his initial brief, Brock did not contend that police lacked probable cause to search the vehicle.  Brock's argument focused instead on the time it took for a drug detection dog to arrive at the scene, not the legality of using the dog or searching the vehicle after its alert.  *See* ECF No. 37.  In his supplemental brief, however, Brock challenges the reliability of the K-9 alert.  ECF No. 48, PageID.316-17.  He argues that there are no clear standards as to what a reliable indication is, that the video shows the handler pointing to the rear wheel well (where the dog alerted) and making multiple passes by the wheel well, and the dog's behavior in jumping on or into the car makes its alert unreliable.  *See id.*

A drug detection dog's reliable alert is sufficient to establish probable cause to search a vehicle.  *See United States v. Navarro-Camacho*, 186 F.3d 701, 706 (6th Cir. 1999) ("A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance."); *Florida v. Harris*, 568 U.S. 237,

17

238 (2013) ("If . . . a dog performs reliably in detecting drugs, and the defendant has not contested that showing, the court should find probable cause").  With regard to the reliability of a sniff search, the Supreme Court has noted that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Harris*, 568 U.S. at 246.  McGuckin testified as to the dog's training and that the dog passed his annual evaluations.  The K-9's alert in this case was thus facially reliable, and Defendant needed to come forward with enough evidence to defeat probable cause.  ECF No. 45, PageID.201-02.  None of Defendant's arguments render the dog's positive drug indication unreliable here. McGuckin testified that certain of the dog's actions were reliable indicators that the dog is trained to perform in the presence of drugs, and that testimony was credible.  ECF No. 45, PageID.204-05.  While defense counsel focuses on McGuckin's statements regarding McGuckin's own training (for example, that McGuckin did not point counsel to specific protocols and said to counsel, "you can ask me" about those protocols), in context McGuckin appeared to simply be saying that the Michigan State Police publishes guidelines on the use of drug

18

sniffing dogs, that he did not have those guidelines or protocols there with him and available to review at the hearing, and that defense counsel was free to question him about his training. *See* ECF No. 45, PageID.210. That does not render his testimony or his training suspect, and the court did not find him less credible from those statements. Defense counsel also did not present the MSP guidelines after the hearing to explain how or why McGuckin's actions departed from those standards. Regarding the reliability of using solely McGuckin's testimony to interpret the dog's actions, McGuckin testified he has been handling drug dogs for 14 years, so again, nothing about his testimony interpreting the dog's actions at particular moments is inherently suspect or lacking in credibility. *Id.* at PageID.219. Nor did defense counsel present any contrary evidence. Although defense counsel asked questions about cueing errors (i.e. giving the dog improper hints, tainting its indications), no testimony was elicited and no evidence was presented indicating that a handler pointing to particular areas of a vehicle undermines the dog's alert on one of those areas. McGuckin also testified that he did not cue the dog that night, and no evidence suggests the court should not find him credible on that point. *See id.*

McGuckin also disagreed that multiple passes over a particular area constitutes cueing, and again no evidence was presented indicating that is not consistent with proper procedure.  Finally, regarding the dog jumping into the front seat and onto the back of the vehicle, McGuckin's testimony addressed both of those instances.  *Id.* at PageID.216-18.  McGuckin interpreted the jump into the front seat as an indication that the dog smelled something, because the dog was not trained to jump into the car unless directed; the jump into the interior of the car was therefore unusual.  *Id.*  McGuckin also testified that he could not, on the video and his memory, say whether the dog jumping on the back of the vehicle was an indication or not.  ECF No. 45, PageID.217-18.  But even though McGuckin could not remember whether he instructed the dog to get up on the back or not, he never testified that was a positive indication, or that the dog doing that affected McGuckin's determination that the dog properly alerted by the wheel well.  In this way, neither action renders the dog's alert by the wheel well inherently incredible; the dog's "sitting" action to alert by the wheel well was different in kind from both jumping into the vehicle and putting his paws on the car, and McGuckin's testimony that this was a reliable,

trained response indicating the presence of drugs was credible. *See* ECF No. 45, PageID.214. The officers on the scene thus had a clear, positive indication by a properly-trained dog, constituting probable cause to search Brock's vehicle for drugs.

### C.   Probable Cause to Search Packages

Lastly, Defendant contends that police lacked lawful authority to search the specific packages that contained the drugs. In his first briefing, he contended that police needed a warrant to search inside the containers, even if the search of the vehicle was supported by probable cause. ECF No. 37, PageID.154 (citing *United States v. Ross*, 456 U.S. 798, 824 (1982), *California v. Acevedo,* 456 U.S. 798 (1982), *Hopkins v Nichols,* 37 F.4th 1110 (6th Cir. 2022)).

But his argument there missed the mark. *Ross* and *Acevedo* do not say that a warrant is necessary to search the containers inside a vehicle even when probable cause exists to search the vehicle as a whole; they say the opposite. Where police officers have probable cause to search an entire vehicle, they may conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages, that may conceal the object of the search. *Ross*, 456 U.S. 798,

809, 822 (holding that "searches of vehicles that are supported by probable cause" are not unreasonable and that "[t]his rule applies equally to all containers" in that vehicle); *Acevedo*, 500 U.S. 565, 570 ("a warrantless search of an automobile . . . could include a search of a container or package found inside the car when such a search was supported by probable cause"); *see also United States v. Stubblefield,* 682 F.3d 502, 507 (6th Cir. 2012) ("[i]f the police have probable cause to search a lawfully stopped vehicle for contraband, then the police have probable cause to search every part of the vehicle and all containers found therein in which the object of the search could be hidden.").[6]  If police had probable cause to search Brock's vehicle for drugs, they had probable cause to search the containers therein that might hide that contraband.

Brock turns to a few slightly different theories in his supplemental brief.  In that brief, he first argues that the Government

---

[6] Defendant's third citation, to *Hopkins v. Nichols*, 37 F.4th 1110 (6th Cir. 2022), was inapposite.  That case concerned whether law enforcement could lawfully view possibly mistreated cattle via the open fields doctrine, whether they had probable cause for animal cruelty because of the cattle's condition, and whether the plain view and open fields doctrines gave them lawful access to seize the cattle.  *Id.* at 1117.  But under what conditions law enforcement may enter onto real property to seize private property does not speak to the substantively different doctrinal analysis available under the automobile exceptions applicable here.

cannot refer to the search as a probable cause search at this stage if the officers referred to it as an inventory search at the time. ECF No. 48, PageID.318; *see* ECF No. 45, PageID.282. But this argument does not change the conclusion above. That Lashbrook may have at times referred to the search of the vehicle as an inventory search is irrelevant to the analysis at this stage; probable cause turns on the objective circumstances, not an officer's subjective intentions. *United States v. Haworth*, No. 22-1050, 2022 U.S. App. LEXIS 28586, at *4 (6th Cir. Oct. 13, 2022) (finding that even though the officers' claimed inventory search did not pass constitutional muster, law enforcement nonetheless had probable cause to search the vehicle); *see United States v. Phillips*, 71 F.4th 817, 824 (10th Cir. 2023) ("[T]he fact that Officer Snyder referred to the search as an inventory search is inconsequential because an officer's subjective reasoning for initiating a search is irrelevant to the probable cause analysis."); *United States v. Lanzon*, 639 F.3d 1293, 1300 (11th Cir. 2011) ("The fact that Detective Clifton recorded the search in the incident report as an inventory search does not change [our] conclusion. A police officer's subjective reasons for a search do not control the legal justification for his actions, as long as objective

23

circumstances justify the search.").  Probable cause existed to search the vehicle, so how the officers referred to the search is irrelevant to the conclusion reached here.

Finally, Brock argues that when the packages were removed from the car and set on the ground, any probable cause to search the packages inside the vehicle under the automobile exception no longer applied to the packages.  ECF No. 48, PageID.319.  For that proposition, he again cites *Hopkins v. Nichols,* 37 F.4th 1110 (6th Cir. 2022), to argue that the seizure of a container is distinguishable from a search of its contents.  ECF No. 48, PageID.319.  That argument is incorrect; as explained above, *Hopkins* concerned whether law enforcement were lawfully in a position to view cattle through the open fields doctrine, whether they had probable cause for animal cruelty because of the cattle's condition, and whether the open fields doctrine again gave them lawful access to seize the cattle.  *Id.* at 1117.  The case on its facts has nothing to say about containers taken from the back of a vehicle during a traffic stop, and its reasoning is not analogous.

Brock also cites *United States v. Chadwick*, 433 U.S. 1 (1977), for the proposition that once a container is reduced to police control and

24

immobilized, the justification for a warrantless search under the automobile exception disappears.  *See id.* at 13–15.  Although Brock does not directly cite *Arkansas v. Sanders*, the rule he advocates for is the one established in that case: "[A]fter the police have seized the object to be searched [from an automobile] and have it securely within their control[,]" police independently need a warrant to search its contents.  *Arkansas v. Sanders*, 442 U.S. 753, 763 (1979).  But the relevant rules from *Chadwick* and *Sanders* were each overruled by *Acevedo*, which concluded that the Fourth Amendment does not prohibit a warrantless "search [of] an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."  500 U.S. at 580; *see also id.* at 579 ("We . . . eliminate the warrant requirement for closed containers set forth in *Sanders*.").  So neither of Defendant's cited authority backs up his position, and the Supreme Court has otherwise consistently held that his argument is without merit.  The Court's post-*Sanders* jurisprudence similarly establishes that physical removal of a container from the vehicle in question has no effect on the ability to undertake warrantless search, so long as probable cause exists when the vehicle is searched.  *Ross*, for

example, involved the warrantless search of two different containers. After making a roadside arrest of the driver of an automobile, police officers opened the trunk and discovered a paper bag that contained what appeared to be narcotics. *Ross,* 456 U.S. at 801. The officers took the car to police headquarters and after a more thorough search discovered a leather pouch containing currency. *Id. Ross* did not distinguish between the search of the paper bag that occurred at the scene of arrest and the later search of the leather pouch, even though the pouch by that point was in exclusive police custody and control. *See United States v. Johns*, 469 U.S. 478, 484-85 (1985) (explaining this very analysis). And in *Johns*, the Court then held that a warrantless search of packages was not unreasonable under the automobile exception even though officers removed the packages from the vehicle, placed them in a warehouse, and waited three days before searching them. *Johns*, 469 U.S. at 486; *see also United States v. Oliver*, 363 F.3d 1061, 1068 (10th Cir. 2004) ("a container in a vehicle may be searched without a warrant within a reasonable time after its removal from the vehicle."). Removing the packages from the vehicle, once probable cause

to search Brock's vehicle existed, thus had no effect on the officers'

ability to search the packages elsewhere on the scene.

## III.   CONCLUSION

For the reasons stated above, the court **DENIES** Defendant's

Motion to Suppress (ECF No. 37).

**SO ORDERED**.


Date: March 13, 2026                    s/F. Kay Behm
                                        F. Kay Behm
                                        United States District Judge